[Civ. No. 7113. First Appellate District, Division Two.—February 5, 1930.]

LILLIAN E. ROBINSON, Respondent, v. JOHN F. Mc-KNIGHT et al., Appellants.

720

Hamilton & Lindley and Hamilton, Lindley & Higgins for Appellants.

P. A. Whitacre and Thomas Whelan for Respondent,

DOOLING, J., *pro tem.*—In this action for malicious prosecution, tried with a jury, plaintiff had judgment for $20,600. On motion for new trial the amount of the judgment was reduced to $10,000. From this amended judgment defendants appeal.

Appellants are husband and wife and respondent is the sister of appellant John F. McKnight. Appellant John F. McKnight swore to a criminal complaint charging respondent with assault with a deadly weapon upon the person of his wife, the other appellant. Upon this charge respondent was arrested, confined in jail for eleven days and, after a hearing before a committing magistrate, dismissed.

The incident out of which the criminal charge grew occurred at the home of appellants on the morning of December 14, 1925. On that morning respondent went to the home of the McKnights and saw Mrs. McKnight, Mr. McKnight having left for his office before respondent's arrival. Although there was a maid present in the McKnight home during the interview, she was not present in the room with respondent and Mrs. McKnight and the only witnesses to what occurred during the interview are respondent and Mrs. McKnight. As to what occurred during that visit, which is agreed to have consumed one and one-half hours or longer, the two witnesses are in sharp conflict.

Mrs. McKnight testified, both at the preliminary hearing and on the trial of this action, that at the outset of their interview respondent leveled a revolver at her and said that she had come with the avowed intention of killing her; that this revolver was held in the same threatening position during practically the entire time that respondent was present in her home, and that respondent further stated that "she had a second gun loaded with gas that they used during the war to get two of my boys." Respondent testified, on the other hand, that she made no threats of any sort against the life of either Mrs. McKnight or her children, although she admits that she took with her a child's toy pistol, which was not exhibited, but which she intended to use to make her escape if she was threatened with injury by either of the appellants while she was in their home.

As a part of her case in chief, respondent's counsel examined Mrs. McKnight, under Code of Civil Procedure,

section 2055. Having elicited from her her testimony that respondent had held the gun leveled at her during practically the entire visit and had repeatedly threatened her life and that of the children, counsel for respondent questioned her at some length as to what else had been said by respondent during the interview. Respondent was afterward placed on the stand and, over the objection of counsel for appellants that the matters were hearsay, self-serving declarations and not within the issues, was permitted to testify in detail as to what was said while she was present in the McKnight home. This consisted largely of a long, accusatory harangue by respondent in which she recited the catalog of her real or fancied grievances against the McKnights from the time of John McKnight's birth to the date of the interview. In this conversation, as testified to by respondent, she accused Mrs. McKnight of committing perjury in proceedings to have her husband declared a bankrupt, "with your diamonds pinned in your corset"; that she had cared for John McKnight when a baby at the sacrifice of her own health; that John McKnight had repudiated a child in bastardy proceedings that grew up "to be his image and is called John McKnight"; that the McKnights had dishonestly deprived the father of John McKnight and respondent of $23,000 and an automobile; that the McKnights had accused respondent of killing her husband, of being a dope fiend and of stealing $4,000 of her mother's money. Enough has been recited to show that these statements were highly inflammatory before the jury and, on the question of their truth or falsity, outside the issues of the case. They were also largely hearsay and all self-serving. Appellants claim that they were inadmissible and that their admission over repeated objection constituted prejudicial error.

In an opinion written by the learned trial judge in passing on the motion for new trial he has this to say concerning this phase of the case: "There is no sort of doubt that much of the matter which the plaintiff testified that she then told Mrs. McKnight, and which, so far as appears from the evidence she may actually have told Mrs. McKnight, was of a character seriously to reflect on the uprightness and honesty of both the defendants, as well as upon their generosity in dealing with their relations. The jury were

charged, however, with the duty here of deciding whether or not the defendants in charging the plaintiff with a crime were animated by malice. To determine that question it was vital that they have the means of deciding whether the defendants in charging the plaintiff with a crime really believed that she had committed it. The plaintiff's whole conduct on the day of the occurrence was what was presented to Mrs. McKnight and what she must be deemed to have taken into consideration in charging the commission of the crime. . . . The whole conversation on the part of Mrs. Robinson is objected to as self-serving. But if it is important to show, not the *truth* of what she said, but what she did say, and if the jury is entitled to know what she *said,* as necessary in determining the defendants' motives in what they did, I apprehend that it was admissible.''

This language of the trial judge, in our opinion, presents a correct solution of this problem. The first question in issue before the jury was whether the conduct of respondent in the McKnight home was such as to lead appellants reasonably to believe that she had committed the crime with which they charged her. Her conduct was a composite of acts and words, which she did and what she said during the hour and a half that she was in their home. Mrs. McKnight contended that during the entire period she was brandishing a gun before her and making repeated threats to take her life and that of her children. To meet this testimony respondent had two alternatives, she could deny categorically that she brandished the gun and made the threats or she could give her own version of what she said and what she did during the period covered by Mrs. McKnight's testimony. The effectiveness of a categorical denial is questionable under the circumstances of this case. Accused before a jury of threatening Mrs. McKnight for an hour and half with a revolver her answer would be a simple ''I did not.'' Who can doubt the comparative force and effect of a detailed statement by Mrs. McKnight of what was done and what was said during an hour and a half of conversation when opposed by a simple, unelaborated denial. Being confronted by such a detailed statement of what she said and what she did, respondent would find herself at a decided tactical disadvantage unless she could meet such testimony

by her own version of what was said and done on that occasion.

In *Johnson* v. *Upfer* 58 Neb. 631 [79 N. W. 547], plaintiff introduced evidence of a conversation with defendant in which defendant was alleged to have made certain admissions. Defendant offered a witness to prove his version of the conversation and an objection on the ground that such testimony would be of self-serving declarations was sustained. In holding that this was reversible error the Supreme Court of Nebraska said: "The evidence sought to be elicited by the interrogatory to which the objection was sustained was open to the criticism of it that an answer to it would allow of evidence a 'statement by the defendant in error in his own favor, a self-serving declaration.' It would be thus objectionable if *to be* considered as substantive evidence, or as in any degree bearing directly on the question of the execution of the note by the party who made the statement; but notwithstanding this, here was a matter, a conversation relative to which all who testified of it agreed that it had transpired, and that there had been but one, and they but differed in regard to its time and place, and what was said. We think clearly the evidence offered was competent, and should have been received. Its tendency would have been to show that defendant in error and his witness had been mistaken in regard to the time and place of the conversation and, further, to prove that when it did take place no admissions were made by plaintiff in error. For such purposes it was entirely pertinent and should have been admitted, and submitted to the jury under proper instructions stating, limiting, and prescribing the purpose of its reception and consideration."

More succinctly the same rule was stated by the Supreme Court of the United States in *Carver* v. *United States,* 164 U. S. 694 [41 L. Ed. 602, 603, 17 Sup. Ct. Rep. 228] : "If it were competent for one party to prove this conversation, it was equally competent for the other party to prove their version of it. . . . Where the whole or a part of a conversation has been put in evidence by one party, the other party is entitled to explain, vary or contradict it." (22 C. J., p. 417; *New York Fidelity etc. Co.* v. *Dorough,* 107 Fed. 389, 393, 394; *Dalton* v. *Bowker,* 8 Nev. 190, 202.)

■ However, we do not solely justify the reception of this evidence on this narrow ground, but on the broader ground that in order to fairly determine the questions of malice and probable cause the jury were entitled to be placed in possession of all the evidence as to what actually transpired during the hour and a half that appellants claim respondent was almost wholly occupied in threatening Mrs. McKnight's life with a gun pointed toward her. What actually was done and what actually was said during that hour and a half was the first essential subject of this inquiry.

The evidence being admissible and competent for this limited purpose, the rule respecting it is covered by *Adkins* v. *Brett*, 184 Cal. 252, 256 [193 Pac. 251, 253]: "When an evidentiary fact is offered for one purpose, and becomes admissible by satisfying all the rules applicable to it in that capacity, it is not inadmissible because it does not satisfy the rules applicable to it in some other capacity, and because the jury might improperly consider it in the latter capacity. This doctrine, though involving certain risks, is indispensable as a practical rule." In the Adkins case the court further held that if he requests it the opposing party for his protection is entitled to have the jury instructed as to the limited purpose for which the evidence is admitted, and such an instruction may at times be necessary at the very time that the evidence is received, but the failure to ask for such an instruction will constitute a waiver. ■ At the close of respondent's testimony on this phase counsel for appellants asked the court to instruct the jury "that they are not to consider the statements made by this witness as proof of the facts contained in those statements to Mrs. McKnight." The court immediately so instructed the jury. In their requested instructions in writing appellants' counsel submitted no instruction on this subject, but the court of its own motion repeated the instruction in substantially the language above quoted, which was the language chosen by counsel for appellants themselves. If they had desired any further instruction on the subject they should have asked for it, and having failed to do so they have no valid ground for complaint.

■ To prove malice counsel for respondent placed the father of respondent and John McKnight on the stand to

prove certain conversations had by the father with John McKnight in which the latter had evidenced *animus* against his sisters, including respondent. These statements, which occurred prior to the prosecution, were certainly admissible. But inextricably interwoven with them were the claims by the father that John McKnight had unjustly deprived his father of $23,000 and an automobile for which the father was endeavoring to get restitution partly for himself and partly for his daughters. As examples, the father testified that he asked his son to give him an automobile to take the place of the one the son had obtained from him and John McKnight in substance replied that he would not give him one so long as he associated with "those skunks of sisters of mine." On another occasion the father testified that he demanded the repayment of $23,000 and John McKnight flew into a rage and said: "I know, because I am rich, you and the girls are plotting how you can get my money." That so much of the father's statements to his son which drew forth such replies, as is necessary to a clear understanding of the replies, is admissible cannot be questioned. (*Estate of Arnold,* 147 Cal. 583 [82 Pac. 252].) Counsel for respondent went no further than this in their case in chief.

As a part of their defense, however, counsel for appellants recalled father McKnight to the stand and had him identify a number of promissory notes given by John McKnight to the father at various times and receipts signed by the father and given to the son. Counsel for respondent had these documents marked for identification, but did not offer them in evidence. On cross-examination counsel for appellants offered the documents so marked and identified and they were received in evidence over objection. It may well be, although we do not express an opinion on the question, that by examining father McKnight concerning these documents, counsel for respondent opened the door to their admission on cross-examination. (40 Cyc., pp. 2499, 2500.) ██ From that time forth, however, both parties devoted a good deal of time to developing the financial controversies between father and son. Of this counsel for appellants complains that it was outside the issues and highly prejudicial. We think, however, that it was properly admitted on the questions of malice.

Inextricably bound up with the claims of father McKnight against the son was his contention that John McKnight had deprived him of what should properly have gone to his daughters, including respondent and the feeling of · *animus* against the daughters in the breast of John McKnight because of what he felt, or claimed to feel, was an unjust claim by his sisters or on their behalf. In the proof of malice a wide latitude is necessarily allowed. Certainly it was open to respondent to prove in a general way that her brother harbored ill will against her on account of claims by her father against him on her behalf, particularly in view of the fact that, according to her testimony, it was to press those very claims that she went to the McKnight home on the day of the alleged assault. That the testimony on this phase bulked so large in the trial is chiefly due to the fact that appellants chose to introduce evidence calculated to refute the claims of the elder McKnight. Once that evidence was in it was open to respondent to rebut it. That, through the zeal of respective counsel, it assumed such proportions toward the close of the trial that there may have been danger of the tail wagging the dog is chiefly due to the insistence of counsel for appellants in undertaking to explain it away.

In its general outlines the jury was entitled to have before it the evidence of this family feud, involving, as it did, a claim by, or on behalf of, respondent against John McKnight. It was competent on the question of malice.

In the early case of *Lyon* v. *Hancock*, 35 Cal. 372, 376, 377, our Supreme Court said: "Malice like fraud, is generally to be inferred from facts and circumstances. Hence the plaintiff is entitled to prove any facts or circumstances which tend, even in the slightest degree, to show malice on the part of defendant. For the same reason, the defendant is entitled to prove any facts and circumstances which tend, in the slightest degree, to prove a contrary motive. . . . It certainly is not contrary to human experience to find a unity of feeling and action accompanying the family relation. Feuds descend from father to son. An injury to one is an injury to all. It certainly is not contrary to human experience for the wife to sympathize with her husband, to share his feelings, to look upon his enemies and

friends as hers also. Such are the teachings of our instincts and of our observation and experience.''

In *Monske* v. *Klee*, 38 Idaho, 314 [221 Pac. 152], the Supreme Court of Idaho said, in holding admissible evidence of family differences in an action for malicious prosecution: ''The rule contended for by appellant is based upon the broad principle that evidence of malice of defendant against persons other than the plaintiff, in an action for malicious prosecution, does not show malice against the plaintiff. Admitting the rule in so far as it applies to persons not members of plaintiff's family, and the reasons for the rule, we think an entirely different rule applies where defendant's acts tend to show malice toward a member of plaintiff's family, particularly his wife. The family tie is perhaps the strongest human tie. Many who are indifferent to personal abuse or attack are aroused to the highest pitch of fury by unwarranted attacks upon the person, character or reputation of a member of the family.''

In such an action the previous relations between the parties themselves may be shown. (*Pickles* v. *Anton*, 49 N. D. 47 [189 N. W. 684]; *Allison* v. *Bryan*, 50 Okl. 677 [151 Pac. 610].) We are satisfied, under the circumstances here shown, particularly in view of the fact that the father's claim was largely made on behalf of respondent and his other daughters, and the *animus* shown against respondent by John McKnight in connection with such claim, that it was not error to admit the evidence complained of.

Appellants likewise complain of the admission of the record of the preliminary hearing on the ground that the dismissal of that proceeding was admitted by the answer. The admission of the answer was not entirely unequivocal and was connected with an allegation that the committing magistrate stated: ''Under all the circumstances the cases must fall.'' But even if the admission of the record was erroneous, which is at least doubtful (*Martin* v. *Pacific G. & E. Co.*, 203 Cal. 291 [264 Pac. 246]), it is hard to see how appellants were harmed. The jury were correctly instructed that the record was admissible solely for the purpose of showing the termination of the action in favor of plaintiff, and that it was no evidence of want of probable

cause. We must assume that this instruction was followed by the jury.

Appellants insist that malice and want of probable cause were not shown. In addition to the testimony above summarized, evidence was introduced that John McKnight had stated that if respondent ever came to his house he would have her arrested. This would support a finding of malice. If respondent's testimony was believed by the jury, and it must have been, Mrs. McKnight testified falsely as to the facts and there was no assault and hence no probable cause for her arrest on that charge. Malice may also be inferred from want of probable cause. (*Burke* v. *Watts,* 188 Cal. 118 [204 Pac. 578].)

Appellants also claim protection from the fact that they acted on the advice of the district attorney. But if, as the jury must have found, they falsely stated the facts that advice was no protection. (*Murphy* v. *Davids,* 181 Cal. 706 [186 Pac. 143]; *Franzen* v. *Shenk,* 192 Cal. 572–576 [221 Pac. 932].) Nor is it a defense that Mrs. McKnight testified under subpoena, if her testimony was false. (16 Cal. Jur. 733.) It was not error to exclude evidence of the advice of a police officer. (38 C. J., p. 431, and cases cited in notes 72–75.)

It was error to admit in evidence checks showing that respondent had given her father small sums of money, but we are satisfied that appellants were not prejudiced thereby. Nor do we think appellants were prejudiced by the introduction of the jail record, to which record had been added at a later date: "One toy pistol." The jailer testified that when respondent was received at the jail she had on her person only $1.76. This was not contradicted nor was it attempted to be shown that she had any deadly weapon at that time. In this state of the record appellants can have suffered no prejudice.

The verdict, as cut down by the court, was not excessive. This was a question primarily for the consideration of the trial judge. Respondent spent eleven days in jail. She testified at the trial that she has spent many years in Europe assembling material for lectures, that she had been giving lectures for some time and that by reason of her experience in jail she was highly nervous and upset physically and unable to continue this work. An account

of the charge appeared in two San Diego papers and as a result a contract to give a series of lectures was canceled. Under the circumstances we cannot say that $10,000 actual damages is excessive, or shows passion and prejudice. No complaint can be made of $100 for attorney's fees for her defense or $500 punitive damages.

On motion for new trial appellants produced the affidavit of the sole dissenting juror that a woman juror had told him after the verdict that during the trial her husband had told her that he had heard John McKnight was a prince of an S. B.   Another affidavit recited that the husband when interviewed had admitted this.   The verdict cannot be impeached by the affidavit of a dissenting juror (*Saltzman* v. *Sunset T. etc. Co.*, 125 Cal. 501, 504–506 [58 Pac. 169], nor by the hearsay affidavit of what the husband said.   Nor, since eleven jurors voted for the verdict, can it be seen how appellants could have been seriously prejudiced.

Appellants' claim of newly discovered evidence was merely cumulative and on a collateral matter.   The trial court did not abuse its discretion in denying a new trial on this ground.   We are satisfied from an examination of the entire record that appellants suffered no prejudice from the few errors that may have crept into the trial.

Judgment affirmed.

Nourse, Acting P. J., and Sturtevant, J., concurred.